**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | |
|---|---|
| PATRICIA A. WREN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:15 CV 35 DDN |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Patricia Wren for disability insurance benefits and social security income benefits under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, 1381. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 8.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I.    BACKGROUND

Plaintiff was born on October 13, 1960. (ECF No. 12 at 197.) She filed her application for Title II benefits on April 15, 2011, and her application for Title XVI benefits on April 30, 2011. (*Id.* at 194–95.) She initially alleged an onset date of December 31, 2002 (*Id.* at 497, 504), but amended that to May 15, 2009 (*Id.* at 11, 643.) She alleges she was unable to work due to knee pain, depression, hepatitis C, asthma, tuberculosis, high blood pressure, and idiopathic thrombocytopenia. (*Id.* at 649.) Plaintiff's applications were denied on May 31, 2011 (*id.* at 193), and she requested a hearing before an Administrative Law Judge. (*Id.* at 231.)

The ALJ held hearings on September 9, 2011; March 5, 2012; and September 6, 2012, and issued an unfavorable decision on September 12, 2012. (*Id.* at 100–85, 200–13.) On December 13, 2012, the Appeals Council granted plaintiff's request for review and remanded the case to the ALJ with instructions to further evaluate plaintiff's RFC based on the assessment of Ollie Raulston Jr., M.D., and to include this more appropriate RFC determination in his hypothetical to the Vocation Expert ("VE"). If needed the ALJ was to obtain additional evidence from a medical expert regarding the severity of plaintiff's impairments. Finally, if there were conflicts between the VE and the Dictionary of Occupational Titles ("DOT") and other used publications, the ALJ was to explain how he resolved the conflicts. (*Id.* at 222–23.)

The ALJ held an additional hearing on October 2, 2013, (*Id.* at 48–99) and issued a second unfavorable decision on December 9, 2013. (*Id.* at 11–26.) The Appeals Council chose not to rehear plaintiff's case (*Id.* at 1–4), and, therefore, the second decision of the ALJ is the final decision of the Commissioner. 20 C.F.R. § 404.984(d).

## II.  MEDICAL AND OTHER HISTORY

On March 29, 2007, plaintiff underwent a disability examination by a state appointed physician, Mary Mullen, M.D. Dr. Mullen found that plaintiff has hepatitis C, post-traumatic stress disorder, and a drug and alcohol dependence. Dr. Mullen, however, opined that plaintiff's disabilities would only be disabling for six to twelve months. (ECF No. 12 at 760–61.)

On May 22, 2007, plaintiff was seen by Thomas Cabrera, M.D., to whom she was referred through a social services program, Rain, for evaluation and treatment of her hepatitis C. Plaintiff reported abstinence from alcohol and drugs since September 2, 2006. She reported attending Alcoholics Anonymous three times a week and completing counseling for her dependency issues. She reported smoking six packs of cigarettes a week. He found she had hepatitis C, depression (treated with Wellbutrin), acid reflux (treated with Nexium), and a rash. (*Id.* at 774–75.)

On June 14, 2007, Dr. Cabrera continued her prescriptions for depression and acid reflux. Plaintiff needed an ultrasound to rule out a gallbladder problem, but due to finances that was not possible at that time. (*Id.* at 772–73.)

On August 4, 2008, plaintiff completed an addiction severity index from the Department of Mental Health. It assessed that her chronic medical problems were interfering with her life. Her problems were slight to moderately severe and treatment was probably necessary. (*Id.* at 782, 787–93.)

Plaintiff was admitted to in-patient treatment for her addictions from August 4 to September 2, 2008, after being referred by her parole officer. She completed the residential program and it was recommended that she complete an intensive outpatient program, continue counseling, attend a twelve step program five to seven times a week, and follow the directives of her parole officer. (*Id.* at 785–86.)

On September 26, 2008, an x-ray of plaintiff's chest showed no active disease in her chest. Her lungs were clear, her heart was within normal size limits, and her bones were normal. (*Id.* at 882.)

On October 20, 2008, plaintiff was diagnosed by the Missouri Department of Health with tuberculosis. She was prescribed Rifampin. Her tuberculosis was monitored by the Missouri Department of Health through March 27, 2009. (*Id.* at 855–72.)

On October 24, 2008, plaintiff was seen again by the Missouri Department of Health. Her chronic health issues included asthma, acid reflux, and hepatitis C. (*Id.* at 877–79.)

On October 28, 2008, medications were ordered for plaintiff. These medications included Benzonatato, a cough suppressant; Loratadine, for allergies; Chantix, for smoking cessation; Veramyst, for allergies; ProAir, for asthma; and, rifampin, for tuberculosis. (*Id.* at 895.)

On November 20, 2008, plaintiff completed an addiction severity index from the Department of Mental Health. It evaluated her hepatitis C and tuberculosis as between

considerable and extreme and found that treatment was absolutely necessary. Plaintiff reported smoking about one pack of cigarettes a day. (*Id.* at 796–803.)

On February 5, 2009, plaintiff was seen at the Montgomery City Medical Clinic. She reported an increase in fatigue, muscle soreness, joint pain, chest and back discomfort. (*Id.* at 815.)

On September 17, 2009, plaintiff completed an Addiction Severity Index for the Department of Mental Health. Her medical issues were assessed as only slightly to moderately problematic and her substance abuse problems were moderate and probably needed treatment. Plaintiff was diagnosed with alcohol dependence, cannabis dependence, cocaine abuse in sustained full remission, amphetamine in sustained full remission, and opiate abuse in sustained full remission. (*Id.* at 834–42.)

On October 11, 2009, plaintiff visited the University of Missouri Emergency Room for a severe cough worsened by smoking. James Gale Osgood, M.D., prescribed her azithromycin, an antibiotic, and diagnosed acute bronchitis. (*Id.* at 917–19.)

Plaintiff was admitted to the McCambridge Center on September 19, 2009 and discharged October 16, 2009. There are no treatment notes ascribed to this in-patient stay. (*Id.* at 824, 848–49.)

Plaintiff participated in outpatient treatment at the McCambridge Center from December 12, 2009, to May 10, 2010. Plaintiff stated that she was seeking a way to help her stay off alcohol. (*Id.* at 823.)

On April 28, 2011, plaintiff was seen at the University of Missouri's Emergency Room in Columbia, Missouri by Henry W. David, M.D. She complained of chronic chest pain that worsened with exertion. She was given Plavix and aspirin. She was also admitted to the inpatient telemetry unit, where she was seen by Deepa S. Prabhakar, M.D. Dr. Prabhakar ordered several tests, and he recommended she stay overnight for observation. Plaintiff left against medical advice. (*Id.* at 904–14.)

On May 5, 2011, plaintiff filed a disability report citing back problems, knee pain, depression, hepatitis C, asthma, tuberculosis, high blood pressure, and idiopathic

thrombocytopenia as the conditions preventing her from working. She was taking no prescription medications at the time and did not list any ongoing treatment for any condition. Her last medical visit was to an Emergency Room in Columbia, Missouri for high blood pressure, chest pains, a blood disorder, and headaches on April 28, 2011. (*Id.* at 648–58.)

On May 11, 2011, plaintiff completed a function report regarding her disabilities. Plaintiff stated that she used to walk everywhere and complete chores, but could no longer do those because she would "get very tired very fast." Furthermore, she could only lie down for about four hours due to back pain. She then stated that she can prepare simple meals, do laundry and dishes as needed. She never goes outside unless it is directly to the car, because it causes too much pain and aggravates her asthma. She stated that she could no longer lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, remember things, complete tasks, concentrate, understand and follow directions, and use her hands. She cannot handle stress anymore and has lost her confidence. (*Id.* at 694–704.)

On May 16, 2011, plaintiff's brother completed a third party function report. He stated that he and his sister live together in an apartment and they do light house work, watch TV, and shop together. He stated plaintiff prepares her own simple meals every day and can do indoor chores, including vacuuming and dishes. He stated she was limited in her ability to lift, squat, bend, stand, reach, walk, sit, kneel, remember things, climb stairs, use her hands, and concentrate. He claimed she cannot handle stress; she gets angry and gets headaches. She also is easily confused. He stated she was currently depressed and no longer goes out or socializes. (*Id.* at 708–15.)

On May 31, 2011, Marc Maddox, Ph.D., completed a psychiatric review technique form after a telephone interview and review of her records. He diagnosed plaintiff with depression, alcohol abuse, and cannabis dependence. Dr. Maddox determined that plaintiff had mild daily activity and social functioning restrictions, as well as moderate concentration, persistence, or pace restrictions. Dr. Maddox provided a mental RFC assessment. He found she was moderately limited in her ability to understand, remember,

- 5 -

and carry out detailed instructions or concentrate for extended periods of time. In all other sections she was listed as not significantly limited. (*Id.* 923–37.)

On June 28, 2011, plaintiff provided an updated medication list. It included over-the-counter seasonal allergy relief; adult low-dose aspirin for high blood pressure; and 200mg ibuprofen, three times a day, for her pain. (*Id.* at 728.)

On May 31, 2011, Lindsey Struemph, a disability examiner, completed a physical residual function ("RFC") assessment. Plaintiff's diagnoses included hepatitis C, a history of tuberculosis, asthma, hypertension, back pain, and knee problems. Ms. Struemph assessed that plaintiff could lift 20 pounds occasionally and 10 pounds frequently. She could stand or walk about six hours in an eight-hour day. Plaintiff would have no limitations in pushing, pulling, stooping, kneeling, crouching, or crawling, but should only climb or balance occasionally. Plaintiff has no problems manipulating objects and has no visual or communicative limitations. She should avoid extreme cold, heat, humidity, vibration, respiratory triggers, and work hazards (i.e. heights and machinery). Ms. Struemph noted that plaintiff took no pain relief medication, but could perform personal care, prepare simple meals, do laundry and dishes, ride in a car, go out alone, drive, shop, and manage her finances. Ms. Struemph gave plaintiff's allegations only partial weight. (*Id.* at 186–92.) Finally Ms. Struemph found, although plaintiff could not perform her past work, she could perform other work and, therefore, was not disabled. (*Id.* at 193.)

On November 21, 2011, plaintiff was diagnosed with bronchitis and given a prescription for doxycycline hyclate. (*Id.* at 956–57, 1087–99.)

On November 23, 2011, plaintiff was seen by Sandi Reese, APRN-BC at the Kneibert Clinic in Poplar Bluff, Missouri for a follow up visit. Her medications included ibuprofen, promethazine (cough suppressant), Proventil nebulizer (asthma), and albuterol. She continues to smoke and either is uncommitted or has no desire to quit. She reported her asthma and hypertension had improved, and her hepatitis C remained unchanged. Pulmonary tuberculosis, which is partially treated, was added as a new problem. (*Id.* 1042–45.)

On December 7, 2011, plaintiff was seen by Nurse Reese for a follow-up visit. Her asthma was reported as improved, but her other conditions—hypertension, hepatitis C, and pulmonary tuberculosis, remained unchanged. New health problems were hematuria, blood in her urine, and gastroesophageal reflux disease. (*Id.* at 1056–60.)

On December 19, 2011, plaintiff was seen by Psychiatric Mental Health Nurse Linda Sue Hammonds at the Kneibert Clinic in Popular Bluff, Missouri. Plaintiff asserted she was having problems with depression and mood swings. She has extreme guilt and does not eat enough. She denies suicidal and homicidal thoughts. She continues to have flashbacks about the murder of her six month old daughter by her former husband in 1978. Plaintiff has had at least eleven suicide attempts and hospitalizations since her daughter was killed. Her last attempt was in 2004. Her last alcohol and cannabis use was September 14, 2011. Her Global Assessment of Functioning was between 40 and 45.[1] Nurse Hammonds diagnosed her with affective/bipolar disorder, posttraumatic stress, polysubstance dependency, and antisocial personality disorder. (*Id.* at 1063–70.)

On December 19, 2011, plaintiff was seen by Nurse Reese for a follow-up. She was prescribed ibuprofen, promethazine, Proventil, Albuterol, Cipro (an antibiotic), Zantac (for heartburn), haloperidol, and keflex (an antibiotic). She was diagnosed with two additional problems: a urinary tract infection and chronic obstructive pulmonary disease ("COPD"). (*Id.* 1077–82.)

On January 6, 2012, plaintiff was seen at the Poplar Bluff Regional Medical Center by Lauren Blackwelder, M.D., to be cleared for admission to an inpatient detox center. (*Id.* at 1102–06.)

On January 10, 2012, plaintiff completed a daily activities report. She stated she stopped working because of her limitations. She asserted she always has difficulties with bathing, going to the bathroom, eating, sleeping, making decisions, finishing tasks, and

---

[1] The American Psychiatric Association no longer uses a Global Assessment of Functioning ("GAF") score to assess a clinician's judgment of an individual's overall level of functioning. Currently, a measure of mental disability is done with the World Health Agency's Disability Assessment Schedule ("WHODAS"). American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

shopping. She reported she often has problems dressing; using the telephone; visiting friends or family; and doing group, church, or club activities. She seldom has problems with taking medicines on time, remembering schedules, doing her personal business or finances, and traveling. She can always make easy meals but will seldom make complicated meals. She defined easy as cereal, sandwiches, and microwave dinners, but any type of prep work was complicated. She limited her standing to ten minutes, sitting to 15 to 20 minutes, and walking to 20 minutes, and she cannot carry anything after a few minutes. She cannot lift, bend, balance, see, hear, speak, remember, concentrate, understand or follow instructions, or get along with supervisors without problems. She always has problems with heat, cold, humidity, fumes, drafts, noise, or vibration. (*Id.* at 967–71.)

On January 27, 2012, plaintiff listed her current medications as haloperidol (an antipsychotic), promethazine (for allergies), and cephalexin (for upper respiratory infections). (*Id.* at 975.)

On April 10, 2012, plaintiff was examined by a state-appointed physician, Barry Burchett, M.D. Dr. Burchett found plaintiff had chronic hepatitis C, COPD, chronic back pain, GERD, and a history of thrombocytopenia. However, he concluded, "[t]here is a full range of motion of the spine. Straight leg raise testing is negative. There is no spasm or significant tenderness in the back. There is no evidence of compressive neuropathy in the lower extremities." (*Id.* at 1118). Dr. Burchett then completed a Medical Source Statement ("MSS") regarding plaintiff's ability to do various work-related activities. Dr. Burchett found plaintiff could frequently lift up to ten pounds and carry ten pounds occasionally due to her back pain. She could sit for up to 30 minutes and stand or walk for an hour without interruption. During a work day she could sit, stand, or walk up to four hours a day. Plaintiff does not require a cane. Plaintiff could reach, handle, finger and feel in both of her hands but could never push or pull. She could operate pedals with either foot occasionally due to her issues with sitting. Plaintiff should never climb ladders, stoop, kneel, crouch, or crawl; she could occasionally climb stairs and ramps and

frequently balance. Plaintiff's environmental limitations include never being exposed to humidity, wetness, dust, odors, fumes, pulmonary irritants, and extreme cold or heat. She has no limitations on the volume of noises. Plaintiff, by herself, is able to shop, travel, ambulate, walk on uneven surfaces, use public transportation, climb a few steps, prepare simple meals, perform personal hygiene matters, as well as lift, sort, or use paper and files. (*Id.* at 1115–18.)

On April 29, 2012, Paul W. Rexroat, Ph.D., completed an MSS regarding plaintiff's mental health limitations. Dr. Rexroat found plaintiff to be depressed, suffering from posttraumatic stress disorder and bipolar disorder with mild psychotic features. Plaintiff was in full, sustained remission from marijuana abuse and partial, sustained remission form alcohol dependence. Dr. Rexroat assessed her GAF score at 51. The MSS stated that plaintiff would have moderate limitations regarding her ability to understand, remember, and carry out complex instructions. Plaintiff had moderate limitations regarding her ability to make judgments on complex work related decisions. She would also have moderate limitations interacting and responding appropriately with the public, supervisors, co-workers, and changes in her routine. (*Id.* at 1127–34.)

From September 4 to 10, 2013, plaintiff was admitted to the University of Missouri Hospital for a psychiatric evaluation. Plaintiff was having recurrent suicidal ideations and was found by her brother, holding a knife to her chest. She admitted to continuing to use marijuana and alcohol four or five days a week. Plaintiff was diagnosed with major depressive disorder that is recurrent and severe. Her GAF at admission was 35. Upon discharge plaintiff's medications were Celexa (for depression), Skelaxin (for muscle pain), Lithium (for bi-polar disorder), Prazosin (for nightmares), Lidoderm (For back pain), and Albuterol (for wheezing). She remained ambivalent regarding her desire to live and welcomed the end of the world. (*Id.* at 1138–52.)

On September 16, 2013, after her case was remanded by the Appeals Council, plaintiff provided additional evidence regarding her medications. She was taking citalopram for depression; lithium, a mood stabilizer; prazosin for blood pressure and

nightmares; and an albuterol inhaler for asthma. Plaintiff also takes 500mg of acetaminophen four times a day for chronic back pain. Plaintiff also provided additional information on her current physicians as well as her prescribed treatment. (*Id.* at 745.)

On December 17, 2013, plaintiff was seen for an EKG and a stress test due to her high cholesterol and history of smoking. Plaintiff was found to have an intermediate to high probability for underlying ischemic heart disease. She was found to have a hypertensive response to exercise but a fair tolerance given her age. Plaintiff was prescribed Toprol for hypertension and encouraged to begin a baby aspirin regimen. She was scheduled for an outpatient cardiac catheterization. (*Id.* at 1169–73.)

On December 30, 2013, an outpatient cardiac catheterization was performed by Charles Tillman, M.D. It showed normal coronary arteries and normal left ventricular size and systolic function. Plaintiff was encouraged to stop smoking and continue her baby aspirin and medication regimen—TriCor (for cholesterol), Ventolin (asthma), Toprol, Claritin, and aspirin. (*Id.* at 1174–80.)

On January 13, 2014, an x-ray was performed on plaintiff's back by George Cyriac, M.D. Plaintiff has marked narrowing in the L4-L5 (lower back) disc spaces with bony sclerosis and osteophyte formations. It showed mild to moderate degenerative changes with no fractures. There is moderately advanced degenerative disc disease at L4-L5 and L5-S1. Mild to moderate bilateral foraminal stenosis at L4-5 and L5-S1 is present. Moderate facet arthropathy at L4-5 and L5-S1 is also present. (*Id.* at 1181–82.)

On January 24, 2014, plaintiff was seen by Marta Fliss, Ph.D., at East Central Missouri Behavioral Health Services for an assessment. Plaintiff reported current symptoms as insomnia, nightmares, mood swings. Plaintiff also reported she was diagnosed with bipolar disorder, borderline personality disorder, PTSD, and depression. Plaintiff was assessed as having PTSD, bipolar disorder, and opioid dependence in early remission, and borderline personality disorder. (*Id.* 1154–62.)

On January 31, 2014, plaintiff was seen by Psychiatric Mental Health Nurse Practitioner Catherine Browning. Plaintiff had no suicidal or homicidal ideations.

Plaintiff was described as cooperative but agitated.  She has some visual hallucinations, but no specific delusions.  Her diagnosis remained PTSD, bipolar disorder, opioid dependence, and borderline personality disorder.  Plaintiff was prescribed lithium and prazosin. (*Id.* at 1163–67.)

On February 3, 2014, plaintiff was seen by John Lucio, D.O., for her lower back pain.  She assessed her pain as being between four and seven on a scale of ten.  Her medications at this time were Metoprolol (high blood pressure), lithium, ranitidine (ulcers), Ventolin, TriCor, prazosin, aspirin, and Benadryl (allergies).  She appeared to be in no acute distress.  She had tenderness from T4 to L2, midline and bilaterally.  She did not need a cane or walker to ambulate.  She could toe-to-heel walk, albeit with some balance issues.  Dr. Lucio explained that complete pain relief cannot be expected, but he would aim to reduce the flare-ups and have moderate improvement in pain symptoms. (*Id.* at 1183–87.)

On March 10, 2014, plaintiff followed-up with Dr. Lucio regarding her back pain.  Plaintiff could not take the steroids prescribed to her, because she could not afford them.  Dr. Lucio changed her medication to Mobic, a non-steroidal pain reliever.  (*Id.* at 1189–90.)

On March 20, 2014, Peter D. Perll, M.D., performed an upper endoscopy on plaintiff.  The endoscopy showed no large mass lesion or ulcers.  (*Id.* at 1191–92.)  She also underwent a colonoscopy while sedated.  No mass lesions or polyps were shown (*Id.* at 1193–94.)

On March 31, 2014, plaintiff saw Dr. Lucio for a follow-up appointment regarding her lower back pain.  Dr. Lucio provided plaintiff with an epidural steroid injection directed at the L5-S1 region for pain management.  (*Id.* at 1195–99.)

On April 22, 2014, an x-ray was taken of plaintiff's lower back which showed degenerative changes in her lower lumbar spine.  (*Id.* at 1200.)  She was seen by Dr. Lucio, who noted after the last steroid injection plaintiff's pain improved 70%.  Plaintiff

was attacked by two pit bulls three days earlier and she received cuts and lesions on her back which continued to bother her. (*Id.* 1201–02.)

On April 25, 2014 an MRI was performed on plaintiff's right knee. The MRI showed that her anterior cruciate ligament had a moderate grade partial tear and there was a torn medial meniscus. (*Id.* at 1203.)

On April 26, 2014, Dr. Lucio provided plaintiff with an epidural steroid injection in her lower back for pain management. (*Id.* at 1204–06.)

On May 6, 2014, plaintiff underwent an EKG and chest x-ray. There were no changes from previous findings. (*Id.* at 1207–09.)


**First ALJ Hearing**

The ALJ held a hearing September 9, 2011. (*Id.* at 100-26.) Plaintiff attended alone, without legal representation. The ALJ then explained to plaintiff that she could retain an attorney for this process. (*Id.* at 101–02) The ALJ explained why an attorney to represent her may be helpful as a social security appeal involves significant amount of medical evidence, as well as the questioning of witnesses, including plaintiff and a vocational expert. (*Id.* at 105–06).) The ALJ explained how different attorneys may be compensated in social security appeals. (*Id.* at 108–09.) He then went over how the five-step process in a social security appeal works. (*Id.* at 113–16.) The ALJ then explained to plaintiff all of the parts of her social security file and admitted them as evidence in the trial. (*Id.* at 117-22.) Plaintiff then decided it was better for her to find a lawyer to assist her in the process, and the ALJ continued the hearing. (*Id.* at 124–25.)

**Second ALJ Hearing**

On March 5, 2012, the ALJ held a second hearing, during which plaintiff was represented by counsel. There was no vocational expert present. (*Id.* at 147–185.) Plaintiff testified to the following.

She is 51 years old, single, with no children, and is currently house sitting for a friend. (*Id.* at 150–51.) She can drive and has a license but does not own a vehicle.

Plaintiff states she does not sleep well and wakes between 3:00 and 6:00 a.m. every morning. She makes coffee, does some cooking, and does the laundry about once a week. She can wash basic dishes. She cannot use a vacuum cleaner, sweep, or mop due to her back pain. Plaintiff can still drive, shop, pay bills, read, fish, camp, watch TV, and walk up to two blocks, but not for a sustained length of time due to pain—headaches, cramps in her hands. (*Id.* at 159–61.) She does not have issues socializing with the neighbors or at her AA meetings. She has been using AA for the past 35 years and her last drink was November 1, 2011. She has used marijuana, heroin, cocaine, and speed over her lifetime. (*Id.* at 161–63.) Plaintiff walks to the supermarket, which is about three blocks away. (*Id.* at 163.) She can bathe herself, but does get a little dizzy and unstable. (*Id.* at 164.) She smokes anywhere six to ten cigarettes a day, even though she has COPD and takes Albuterol for her breathing problems. She was last in the emergency room in November 2011 for bronchitis. (*Id.* at 165–166.)

Plaintiff was taking haloperidol, promethazine, and cefazolin, but could no longer afford them. Many of her medications either adversely affect her liver or her tuberculosis. (*Id.* at 166–68.) She is also diagnosed with idiopathic thrombocytopenia, a disorder than can lead to easy or excessive bruising and bleeding. She also has severe back pain after years of hard labor working in kitchens and construction work. Her knees also hurt and she has had surgery on her right knee. Plaintiff has high blood pressure and would take medication for it, but she cannot afford it right now due to Medicaid discontinuing coverage. Plaintiff also asserted that she has muscle fatigue in her arms. (*Id.* at 169–73.)

Plaintiff asserts she suffers from depression evidenced by frequent crying spells, seeing hallucinations, and hearing voices. She has attempted suicide several times, but none recently. (*Id.* at 175.)

Plaintiff states she can sit for a while, but it is very uncomfortable. She can stand for only ten minutes before it hurts and she has not lifted anything over ten pounds in a very long time. She has problems bending, stooping, crouching, kneeling, and crawling. Recently, she has only been able to keep a job for four days at most. (*Id.* at 177–79, 182.)

Plaintiff asserts she gets confused very quickly and then gets frustrated and walks away from what she is doing, rather than complete the task. Plaintiff naps four out of seven hours during the day in addition to her normal sleeping hours, which are often interrupted by poor sleep. She asserts that in 2007 her doctor told her she had an autoimmune deficiency but was not sure which one it was, but plaintiff should see a specialist. (*Id.* at 180–82.)

The ALJ noted the lack of medical documentation in the case to support plaintiff's ailments and ordered a consultative orthopedic and psychological examination. (*Id.* 183.)

**Third ALJ Hearing**

On September 6, 2012, the ALJ held a third hearing because after the March 5, 2012 hearing, several additional exhibits were admitted. Plaintiff was represented by counsel. A vocational expert, Darrell W. Taylor, Ph.D., and a medical expert, Ollie D. Raulston, M.D., were also present. (*Id.* at 129–44, 400–02.)

Dr. Raulston testified to the following. Dr. Raulston examined plaintiff's records which have very little evidence in them—a diagnosis of history of low back pain, dorsal pain, and knee pain. Plaintiff's first real exam was conducted by Dr. Burchett in April of 2012, at the request of the ALJ. (*Id.* at 132.) Dr. Raulston stated that none of plaintiff's diagnosis would meet a listing and her RFC would fit the light duty physical demand level. This would entail lifting and carrying 20 pounds occasionally, 10 pounds frequently; standing, walking, and sitting six out of eight hours a day, with an option to change positions every hour for at least five minutes; she can balance, kneel, and stoop frequently; and climb stairs, ramps, crawl, and crouch occasionally. She would be limited to frequent overhead reaching due to her low back pain. Environmentally, she should not be on unprotected heights, scaffolding, ladders, and ropes. She could only be occasionally exposed to fumes, gases, and so forth. (*Id.* at 132–33.) Dr. Raulston found plaintiff's limitations to be less than those found by Dr. Burchett, because his own examination yielded completely normal findings—no tenderness or spasms in the lower back; no motor

or sensory deficits; normal reflexes; no atrophy; an ability to fully squat; walk heel and toe walk normally; and a normal gait. Plaintiff sat through the exam with ease. Dr. Raulston opined that Dr. Burchett's limitations were based on plaintiff's subjective symptoms. (*Id.* at 134–35.)

Plaintiff then testified that Dr. Burchett's exam was only fifteen minutes long and was a predominantly hands-off exam. She wobbled during the toe-to-heel walk and had to have assistance to get up from the squat. (*Id.* at 135–36.)

Vocational Expert Dr. Taylor testified to employment prospects of hypothetical persons. The ALJ's first hypothetical was of a person who could lift, carry, push, and pull 20 pounds occasionally and less than ten pounds frequently. This person could sit, stand, and walk for six out of eight hours a day. Occasional climbing, stooping, crouching, kneeling, crawling is acceptable, but no exposure to ladders, ropes, or scaffolds. This person could not have concentrated exposure to moving machinery, unprotected heights, dust, fumes, gases, extreme cold or heat, humidity, and vibration. According to the VE this person could be a courier again, but not a kitchen worker. Also, this person could perform other light, unskilled work such as housekeeping. (*Id.* at 139–40.)

Plaintiff's attorney then limited a hypothetical person to only lifting ten pounds at most; carrying ten pounds at most occasionally; and only standing, sitting, or walking one hour at a time. The VE stated this person would be limited to sedentary work.

Plaintiff's attorney further limited this person to only a moderate ability to make complex work-related decisions; moderate problems interacting with the public, supervisors, or co-workers; as well as, moderate limitations in responding appropriately to usual work situations and routine changes. The VE stated this person could still do sedentary work, but it would just be unskilled work.

The ALJ followed-up by asking whether only simple and repetitive instructions were allowed, would housekeeper, courier, and hand packer still be available. The VE stated that they would still be available. (*Id.* at 141–43.)

## First Decision of the ALJ

On September 21, 2012, the ALJ issued a decision unfavorable to plaintiff. The ALJ found that plaintiff was not gainfully employed since December 31, 2002. She may have worked some after June 2011, but there is no clear evidence that it rose to the level of substantial gainful activity. (*Id.* at 201–02.) The ALJ found that she had the severe impairments of disorders of the back, hepatitis C, asthma, bipolar disorder, and PTSD. (*Id.* at 203.) The ALJ then found that none of these impairments or combination of these impairments met or medically equaled any of the listed impairments. (*Id.*) Additionally, the ALJ assessed plaintiff's mental impairments using "paragraph B" criteria and found that she only had mild restrictions regarding daily activities, moderate difficulties in social functioning, and has moderate difficulties regarding concentration, persistence, or pace. He found that there have been no extended episodes of decompensation. (*Id.* at 204.) Additionally, the ALJ found that "paragraph C" criteria were also not met. (*Id.*)

The ALJ determined that the plaintiff's RFC included the ability to perform light work, but only to lift and carry 20 pounds occasionally and less than 10 pounds frequently. He found that plaintiff can stand, walk, or sit for a total of six hours in an eight hour workday and can occasionally climb stairs, stoop, crouch, kneel, and crawl, but that she should not climb ladders, ropes, and scaffolds and never be exposed to moving machinery, unprotected heights, dust, fumes, gases, extreme cold, humidity, or vibrations. He found that plaintiff can perform simple repetitive tasks with occasional social interaction. (*Id.* at 204.) Plaintiff could still perform her past work as a courier. Regarding other types of work under the light work category, the ALJ considered the additional RFC limitations in conjunction with plaintiff's age, education, and experience. (*Id.* at 212) The ALJ found that plaintiff could perform other work that exists in the national and state economies such as housekeeper and hand packer. (*Id.* at 211–12.) The ALJ then found plaintiff was not disabled. (*Id.* at 212.)

**Appeals Council's Remand**

On December 13, 2012, the Appeals Council remanded plaintiff's case back to an ALJ for resolution of two issues. First, Dr. Raulston opined that plaintiff would need to adjust positions every hour for five minutes. This limitation was not included in the RFC or hypotheticals posed to the VE. Second, the ALJ determined that plaintiff has past relevant work as a courier, but it was never determined that this work as a courier was performed at a level constituting substantial gainful activity. Upon remand, the Appeals Council instructed an ALJ to give further consideration to the RFC and the opinion of Dr. Raulston; if necessary, obtain an additional medical expert's opinion regarding plaintiff's impairments; and obtain an additional VE opinion regarding the assessed limitations, as established by the record as a whole, on the claimant's occupational base. (*Id.* at 222–23.)

**Fourth ALJ Hearing**

On October 2, 2013, the ALJ held a hearing in which plaintiff was present with counsel. (*Id.* at 48–99.) Plaintiff testified to the following.

She had a suicidal episode and was admitted to the University of Missouri Psychiatric Center on September 4, 2013. She began drinking after she was reminded of her ex-husband killing her six month old daughter in 1979. This was approximately her tenth time attempting suicide and her fifth time being hospitalized. (*Id.* at 54–55.) Plaintiff testified that she can no longer hold a gallon of milk, because of her lack of grip strength. She can only walk about a block-and-a-half to the mailbox, but has to rest after reaching the mailbox. She can dress herself without assistance from another, but has balance issues. She can bathe herself without assistance from another but has to hold the rail in the bathtub due to balance issues. (*Id.* at 58–59.) Plaintiff uses a cane or a stick to help her walk due to her dizziness, although it is not prescribed for her. (*Id.* at 75–76.)

Plaintiff's last job was in June 2011 and lasted only four days. She was removed from the schedule and fired due to her inability to do the job, fry cook. This situation has

happened several times in the past few years—she was "removed from the schedule" due to her inability to do the job that she was hired to perform. She worked as a courier for a bank, but then she drove a truck through her house, on purpose, and was arrested. She no longer drives because she gets confused easily and her arms become tired, numb, and tingly. (*Id.* at 61–62.) The majority of the day plaintiff remains in a reclining loveseat because of the pain and fatigue. She takes several naps during the day because her sleep is broken. (*Id.* at 63–64.)

Plaintiff has applied for, but does not have Medicaid, and her prescriptions have been filled and paid for by her brother. Plaintiff was employed full-time in the majority of the jobs listed including cook, dispatcher, warehouse worker, and courier. (*Id.* at 67–69.) Plaintiff has had alcohol in the last four months, even though she is an alcoholic. (*Id.* at 70.) Plaintiff asserts that she cannot work because of her back pain, headaches, confusion, and inability to lift or do certain repetitive motions such as cutting and chopping. (*Id.* at 71.) Her asthma is aggravated by household cleaners such as bleach. She currently has a bulge in her spine and her middle and lower back hurts. She has difficult lifting, standing, and walking. Her lifting requirements as a courier were limited to five to ten pounds. She has not been able to lift anything over ten pounds for many years (*Id.* at 78–80.)

Plaintiff testified that she would go to the doctor if she could afford it, but without assistance from Medicare. She had many unpaid medical bills, and will go to the emergency room when she absolutely has to and then cannot pay the bills. Her hepatitis C medications were paid for a by a federally funded program, which was discontinued. Her tuberculosis medications caused problems with her liver due to the hepatitis C. (*Id.* at 73–75.)

A Vocational Expert, Deborah Determan, M.S., testified after plaintiff clarified some of her past work, and the ALJ provided a detailed hypothetical person. The ALJ limited the RFC to occasionally lifting up to 20 pounds, frequent lifting and carrying up to ten pounds; standing, walking, and sitting for six out of eight hours in the work day; no climbing on ropes, or ladders and scaffolds; only occasional climbing on ramps or stairs;

no more than occasional stooping, kneeling, crouching or crawling; and avoiding concentrated exposure to extreme hot or cold, humidity, vibrations, gas, fumes, odors, dust, unprotected heights, and dangerous moving machinery. This person could understand, remember, and carry out simple instructions, make simple decisions, and tolerate minor, infrequent changes in routine. This person should not work around young children. (*Id.* at 84–85.) Under these limitations, the person could still work as a courier, but no other past work. This hypothetical person could also be a photocopy machine operator, mailing-machine operator, or a mailroom clerk. All of these jobs are light exertional category with a skill level of two. (*Id.* at 85–87.)

The second hypothetical provided by the ALJ included a person who had the same above limitations but also a requirement to change position every sixty minutes for up to five minutes at a time. The VE opined that a person with the additional limitation of changing positions could still work as a courier, because that occupation is driving and then getting out of the vehicle and delivering and then sitting and driving again. (*Id.* at 87–88.) Additionally, that person could still work as a photo-copy machine operator, a mailroom clerk, or a routing clerk. Based on the VE's experience, knowledge, and training these jobs would allow for a person to alternate positions. (*Id.* at 88–89.)

The ALJ then provided a different hypothetical which limited a person to lifting and carrying up to 10 pounds occasionally and frequently; standing or walking for four hours out of an eight-hour workday, but only for an hour at a time; and sitting for four hours out of an eight-hour workday, but only for thirty minutes at a time. This person could not push or pull, only occasionally reach, frequently handle, and occasionally operate foot controls. This person could not climb on ladders or scaffolds, stoop, kneel, crouch, or crawl. This person could occasionally climb stairs or rams and frequently balance. There could be no exposure to humidity, wetness, dust, odors, fumes, extreme temperatures and only occasional exposure to moving mechanical parts or operating a motor vehicle. This person could be exposed to frequent vibration. The ALJ described this as sedentary, unskilled, and limited to only simple instructions. The VE opined that

this person could not work as a courier with those limitations, nor could the person perform any work.

The ALJ then changed the hypothetical person to one that could frequently handle, but could not push or pull and could only occasionally operate foot controls. Two sedentary and unskilled jobs would be available for this person: document preparer and order clerk for food and beverage. These possible jobs, however, are not consistent in the Dictionary of Occupational Titles, because they require sitting six out of eight hours in a workday, which this person, hypothetically, cannot do. The VE based her decision on her experience, knowledge, and training. (*Id.* 90–91.)

Claimant's attorney then questioned the VE. The VE admitted that a courier job would require possible exposure to extreme temperatures in the summer and winter, which does not align with the ALJ's hypotheticals. When addressing this limitation on redirect by the ALJ, the VE highlighted that it would depend on what "concentrated exposure" meant. The VE then opined it is unlikely that a courier position would be available to someone who could not be exposed to extreme heat or cold. However, the VE noted that there is no stooping requirement in the order clerk or document preparer jobs. The VE was using an electronic program which compiled the Dictionary of Occupational Titles and not the actual book in her determinations. (*Id.* at 92–96.)

The attorney then asked a hypothetical a hypothetical question about a person prevented from stooping, kneeling, crouching, or crawling; only occasionally reaching; and never pushing or pulling. The VE opined that those limitations would mean a person could not be employed gainfully. (*Id.* at 96–97.)

## III.   <u>DECISION OF THE ALJ</u>

On December 9, 2013, the ALJ found plaintiff not disabled. (*Id.* at 11–26.) At Step One the ALJ found that plaintiff met the insured status requirements through

December 31, 2012, and had not been engaged in substantial gainful activity since December 31, 2002, her alleged onset date. (*Id.* at 14.)

At Step Two the ALJ found plaintiff had severe impairments that have more than a minimal effect on her ability to engage in work. These impairments are hepatitis C, asthma, chronic obstructive pulmonary disease, a history of tuberculosis, mild degenerative disc disease of the lumbar spine, bipolar disorder, PTSD, alcohol dependence in partial remission, and cannabis dependence in full, sustained remission. The ALJ also determined that the plaintiff had several nonsevere ailments: hypertension, GERD, and knee pain. (*Id.* at 14.) The ALJ determined that plaintiff's complaints of idiopathic thrombocytopenia and hand-shaking were not medically determinable, because they had not been established by an acceptable medical source. (*Id.* at 15.)

At Step Three the ALJ went through each disorder separately and compared plaintiff's symptoms to those listed in the C.F.R. to determine if any met a listing. The ALJ found none of her disorders, alone or in combination, meet or are medically equivalent to a presumptively disabling listing under 20 C.F.R Part 404, Subpart P, Appendix 1. Additionally, the ALJ considered plaintiff's mental impairments in relation to "paragraph B" and "paragraph C" criteria[2] and found they are also not satisfied. Specifically, the ALJ found plaintiff only has mild restrictions in daily living and social functioning and only moderate difficulties regarding pace, persistence, and concentration. She has not experienced repeated episodes of extended decompensation due to her mental impairments. (*Id.* at 15–16.)

The ALJ then considered the entire record and determined plaintiff had the RFC to perform light work, which included lifting up to twenty pounds occasionally and ten pounds frequently. Plaintiff can stand, walk, and sit six hours out of eight in a workday. She must be able to change positions every hour for up to five minutes at a time. Plaintiff should never climb ropes, ladders, or scaffolds and only occasionally climb ramps or stairs, stoops, kneel, crouch, or crawl. She should avoid concentrated exposure to

---

[2] "Paragraph B and C" criteria are listed in 20 C.F.R. Subpt. P, app. 1, § 12.00.

temperature extremes, humidity, vibrations, fumes, odors, dust, gases, or poorly ventilated workspaces. She should avoid the hazards of heights or moving machinery as well. She is able to understand, remember, and carry out at least simple instructions. She can only make simple decisions at work and tolerate only minor infrequent changes in routine. She cannot work around infants or young children. (*Id.* at 17.)

At Step Four, the ALJ found plaintiff unable to perform any past relevant work. (*Id.* at 25.)

Finally, at Step Five the ALJ, based on the testimony of a VE, found that work plaintiff could perform existed in significant numbers in both the national and state economies. (*Id.* at 25–26.)

## IV.    GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. *Id.* As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to

determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing the five-step process); *Pate-Fires*, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work ("PRW").  *Id.* at § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating she is no longer able to return to his PRW.  *Pate-Fires*, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

## V.    DISCUSSION

Plaintiff argues that the ALJ erred by improperly disregarding plaintiff's subjective complaints of pain and misevaluating the evidence under the *Polaski* standard.  *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).  Plaintiff argues that the ALJ's reasons for discrediting her—a lack of medical evidence, plaintiff's attempts to work, sporadic use of medication, and sporadic treatment—were improper and not harmless.  (ECF No. 19 at 61–67.)  The Commissioner responds that an ALJ's credibility determinations are deferred to if supported by valid reasons, and the record as a whole supports a finding that plaintiff's subjective complaints were not supported.  (ECF No. 22 at 5.)  The court agrees with the Commissioner.

**The *Polaski* Standard**

In evaluating a plaintiff's subjective symptoms using the *Polaski* factors, the ALJ must make a credibility determination. *Polaski*, 739 F.2d 1320 (8th Cir. 1984); *see Ellis v. Barnhart*, 392 F.3d 988, 995-96 (8th Cir. 2005). These factors include: (1) the plaintiff's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *Polaski*, 739 F.2d at 1322. The ALJ does not need to discuss each factor separately; rather, the court will review the record as a whole to ensure relevant evidence was not disregarded by the ALJ. *See McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011); *see also Dunahoo*, 241 F.3d 1033, 1039 (8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth."). The ALJ must make an express credibility determination for rejecting plaintiff's complaints of pain by giving reasons for discrediting the testimony, settling the inconsistencies, and discussing the *Polaski* factors. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

Subjective complaints may be discounted if there are inconsistencies in the record as a whole. *Polaski*, 739 F.2d at 1322; *see also McDade v. Astrue*, 720 F.3d 994, 998 (8th Cir. 2013) (the ALJ discounted plaintiff's credibility when the evidence showed that plaintiff "was not unduly restricted in his daily activities, which included the ability to perform some cooking, take care of his dogs, use a computer, drive with a neck brace, and shop for groceries with the use of an electric cart."); *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."). An ability to complete daily activities may also be used in mental limitation assessments. *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) ("[Plaintiff's] mental impairments did not prevent him from engaging in substantial activities of daily living: [plaintiff] cares for his family, performs household chores, drives a car, visits friends, plays games such as dominoes and cards with his friends, and plays catch with his son.

[Plaintiff] also pays bills, passed an oral drivers' license exam, and testified that he could follow the instructions necessary for making a cake."). Furthermore, physician's opinions may be discounted or given little weight if primarily based on subjective complaints and not objective medical evidence. *McDade*, 720 F.3d at 999.

**The ALJ Evaluation of Plaintiff's Subjective Complaints of Paint**

The question before the ALJ was not whether plaintiff experienced pain at all, but rather the severity of her pain. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). Plaintiff argues that the ALJ may not disregard subjective complaints of pain solely because they are not fully corroborated by the objective medical evidence. (ECF No. 19 at 65) (citing *Nelson v. Heckler*, 712 F.2d 246, 248 (8th Cir. 1983)). But the ALJ did not make his determination solely on objective evidence (or the lack thereof). (ECF No. 12, at 17-25). While he did note that the objective medical evidence would not support plaintiff's claims about the degree of her pain, he also considered the report of plaintiff's brother, plaintiff's daily activities, her work history, her treatment and use of medication, and her ability to file multiple social security applications. In particular, he found plaintiff's daily activities and sporadic treatment and use of medication discredited her testimony. Furthermore, the ALJ expressly considered the condition of chronic low back pain in limiting the claimant's RFC to only light work and requiring an alternating sit/stand option. (*Id.* at 19). Accordingly, the ALJ in this case relied on substantial evidence in concluding that while plaintiff may experience chronic low back pain, it was not so severe as to be disabling, whether alone or in combination with plaintiff's other symptoms.

The ALJ wrote at length about the divergence between plaintiff's asserted limitations and what she reports being able to accomplish daily. While noting that plaintiff may not be able to engage in activities she could in the past, or might require more time to complete activities than she once did, "she is more active than would be expected if all of her allegations were credible." (*Id.* at 23). Plaintiff reported that she has

difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, climbing stairs, seeing, completing tasks, concentrating, understanding, following instructions, and using her hands. (*Id.* at 18, 694–704.) However, she testified at the multiple ALJ hearings that she could attend to her own hygiene without another's assistance, perform light household chores, go shopping, and handle her own finances. (*Id.* at 23, 694–704, 967–71.) Her brother also stated in a third party function report that she had difficulties in the aforementioned areas, but then stated plaintiff prepared her own simple meals, did light housework, including vacuuming and dishes, and went shopping with him. (*Id.* at 23, 708–15.)

Dr. Burchett opined that plaintiff could, by herself, shop, travel, ambulate, walk on uneven surfaces, use public transportation, climb a few steps, perform personal hygiene matters, prepare simple meals, and lift, sort, or use paper files, but then attempted to limit plaintiff's RFC to a disabling one. (*Id.* at 21, 1115–18.) The ALJ was proper in giving little weight to Dr. Burchett's assessed RFC. *See McDade*, 720 F.3d at 999. These activities belie plaintiff's assertions of disabling conditions. *See, e.g., Id.* at 998; *Medhaug*, 578 F.3d at 817. The ALJ concluded that Dr. Burchett's limitation on "never stooping, kneeling, crouching, or crawling and the limitation to occasional reaching is not consistent with the claimant's admitted activities of daily living including cleaning, shopping, and doing laundry." (ECF No. 12 at 21.) The ALJ also found that limitation to be inconsistent "with the fact that the claimant has never alleged any difficult[y] dressing or caring for her personal hygiene, as noted by Dr. Burchett." *Id.*

The ALJ in this case also considered the fact that plaintiff engaged in some work activity after her alleged onset date. (ECF No. 12 at 24.) The ability of a claimant to work previously while suffering from the same condition she now asserts as disabling may be used by the ALJ to evaluate the claimant's veracity. *See Worden v. Colvin*, No. 4:14 CV 1361 NCC, 2015 WL 4920779, at *9 (E.D. Mo. Aug. 18, 2015) (citing *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990)). The ALJ in this case noted that plaintiff worked as a short order cook, dishwasher, and kitchen helper at multiple dining

establishments, even if not at substantial gainful activity levels, and that this demonstrates plaintiff's pain was not as severe as she alleges. (ECF No. 12 at 24.)

Regarding treatment and medication, the use of predominately over-the-counter medications to treat pain can be used to assess complaints of disabling pain as not credible. *Clevenger v. Soc. Sec. Admin.*, 567 F.3d 971, 976 (8th Cir. 2009). Although plaintiff alleged that she took pain medications daily, they are largely over-the-counter. (600 mg of ibuprofen a day, 2000mg of acetaminophen a day, topical applications of Lidoderm) (ECF No. 12 at 728, 745, 1143.)

In plaintiff's favor, on the other hand, the record includes her receiving epidural steroid injections in her lower back for pain management as well as prescriptions for Mobic and Skelaxin. (*Id.* at 1143, 1189-206.) She alleges she was unable to obtain treatment and pay for medication due to lack of insurance. (*Id.* at 1154, 55, 59.) "While these limitations, if accepted as credible, might have supported a disability finding, we will not substitute our opinions for that of the ALJ, who is in a better position to assess a claimant's credibility." *Johnson v. Chater,* 87 F.3d 1015, 1018 (8th Cir. 1996).

A reasonable mind would find the record adequate to support the conclusion that plaintiff may experience some pain but is not disabled under the Social Security Act. Plaintiff reported that the steroid injections eliminated 70% of her pain. (ECF No. 12 at 1200.) The ALJ may consider whether pain can be controlled with treatment. *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997). "Impairments that are controllable or amenable to treatment do not support a finding of disability." *Id*. The ALJ specifically noted that narcotic pain treatments were not regularly prescribed or followed. (ECF No. 12 at 24). Additionally, at the same time plaintiff alleges she was unable to afford this treatment, she was able to keep up drug, smoking and alcohol habits, purchasing at least a pack of cigarettes a day (*Id.* at 798, 803, 911, 1037, 1066, 1093, 1103-5, 1116, 1139). The fact that Plaintiff chose not to use those funds on treatment is an inconsistency that weighs against her credibility. *See Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (finding the claim that plaintiff could not afford medication inconsistent with the fact that he did

not choose to forego smoking three packs of cigarettes a day to help finance pain medication).

Further, as the ALJ noted, the record does not indicate that claimant was ever refused treatment or medication for any reason. While the record suggests that plaintiff sought assistance from Medicaid, the evidence as a whole supports the ALJ's conclusion that plaintiff's complaints of disabling pain were not credible. The ALJ considered the entire record and determined that plaintiff was experiencing pain, but that it was not so severe as to be disabling. The evidence in the record, particularly the multiple descriptions of plaintiff's daily activities, substantially supports this conclusion, in that a reasonable mind would find it adequate to support the conclusion that plaintiff is not disabled under the Social Security Act.

## VI.    <u>CONCLUSION</u>

For the reasons set forth above, the final decision of the defendant Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.


_____  S/  David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**


Signed on September 7, 2016.